UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

| | | |
|---|---|---|
| DECKER B. JORDAN, | ) | |
| | ) | |
| Petitioner, | ) | No. 0:22-CV-43-REW |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID LEMASTER, Warden, | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| Respondent. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Decker Jordan is an inmate confined at the federal prison in Ashland, Kentucky.  Jordan
has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. *See* DE 1
(Petition). The Court must screen the petition pursuant to 28 U.S.C. § 2243. *See Pillow v. Burton*,
852 F. App'x 986, 989 (6th Cir. 2021).[1] Jordan's custody traces to a 2011 general court-martial
and nearly 30 years for sex crimes against a minor.  After the military discharged Jordan as a
service member, the BOP took custody of him in 2014 under an interagency agreement.

Jordan asserts two distinct claims in his petition. First, he alleges that since 2014 he has
been confined "in the immediate association of foreign nationals while incarcerated with the
Bureau of Prisons[.]" *See* DE 1 at 6. He contends that Article 12 of the Uniform Code of Military
Justice ("UCMJ"), 10 U.S.C. § 812, prohibits such "immediate association" because he is a former

---

[1]  A petition will be denied "if it plainly appears from the petition and any attached exhibits that the petitioner is not
entitled to relief." Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts (applicable to §
2241 petitions pursuant to Rule 1(b)). The Court evaluates Jordan's petition under a more lenient standard because he
is not represented by an attorney. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Franklin v. Rose*, 765 F.2d 82, 84-85
(6th Cir. 1985) (noting that "allegations of a pro se habeas petition, though vague and conclusory, are entitled to a
liberal construction" including "active interpretation" toward encompassing "any allegation stating federal relief")
(citations and internal quotation marks omitted).

1

member of the military incarcerated pursuant to a court martial. *Id*. at 8. For relief, Jordan seeks to have his sentence shortened by four days for every day that such impermissible commingling has occurred. *See id.*. at 15. The resulting sentence reduction of more than 31 years would, if applied, result in Jordan's immediate release.

Second, Jordan alleges that after he was convicted administratively of a prison disciplinary offense in 2020, the warden (at a prior facility) placed an unauthorized restriction upon his spending at the commissary, purportedly for the remaining 15 years of his prison sentence. *Id*. at 15-19. This restriction actually remained in place for 162 days until it was removed in 2021 upon Jordan's transfer to his current place of confinement. *See* DE 1 at 15-16, 19. Jordan contends that this restriction amounted to cruel and unusual punishment, a violation of Article 55 of the UCMJ, 10 U.S.C. § 855. *Id*. at 16-19. For relief, Jordan contends that he is entitled to have his sentence shortened by 810 days, a period equal to five days for every day that the restriction was in place. *See id*. at 19.

The Court has completed its review of Jordan's petition and will deny relief on initial screening. Jordan failed to exhaust his remedies, has no claim under §§ 812 and 855, and presents a meritless theory under § 855, all as explained more fully below.

**I**

In August 2011, while serving as a submarine officer at a naval base in Hawaii, Jordan was convicted by court martial on several specifications arising out of the sexual abuse of his minor daughter over a period of four years, beginning when she was six years old. *See United States v. Jordan*, No. NMCCA 201100621, 2012 WL 5995839, at *1 (N-M. Ct. Crim. App. Nov. 30, 2012), *petition for review denied*, 72 M.J. 403 (C.A.A.F. 2013). The charges included two specifications of rape of a child under the age of 12, one specification of aggravated sexual contact of a child

under the age of 12, and three specifications of aggravated sexual abuse of a child under the age of 12. *Id*. Jordan was sentenced to confinement for 29 years and 6 months, forfeiture of certain military benefits, and a dishonorable discharge. Jordan's dishonorable discharge was ordered executed on October 9, 2013. *Id*. Following further proceedings, Jordan's conviction and status was finalized ("finish-filed") in September 2014. *See In Re Jordan*, 80 M.J. 605, 608 (N-M. Ct. Crim. App. 2020) (*en banc*).[2]

In May 2014, Jordan was transferred from the United States Disciplinary Barracks ("USDB") in Fort Leavenworth, Kansas, into the custody of the Federal Bureau of Prisons to serve his carceral sentence. *See* DE 1 at 6. Since that time, Jordan has been housed at federal prisons in Pennsylvania, Virginia, and Kentucky. *Id*. Jordan alleges that when he was transferred in August 2014 to the federal prison in Petersburg, Virginia, he "was immediately placed into a general population housing unit, D-South, with foreign nationals from various countries." *Id*. at 9. Jordan indicates that while confined at that facility he was housed with inmates from China, Mexico, El Salvador, Argentina, Guatemala, Columbia, Great Britain, the Dominican Republic, Syria, Iran, and Yemen. *Id*. at 9-11. Indeed, he recounts with considerable detail many of their names, nationalities, and his interactions with them. *See id*. Jordan was eventually transferred to the federal prison in Ashland, Kentucky, on February 25, 2021. *See id*. at 1 At that facility Jordan states that he was and remains confined with inmates from Nigeria and foreign countries in South America. *Id*. He asserts § 812 violations throughout his federal incarceration.

---

[2] In August 2020, the U.S. Navy-Marine Corps Court of Criminal Appeals ("NMCCCA") denied Jordan's petition for relief from his convictions and sentence, whether construed as a petition for a writ of habeas corpus or as a petition for a writ of error *coram nobis*. *See id*. at 611-13. That decision described Jordan as a "former Service Member" and noted his discharge executed in October 2013. *See id.*

Prior to his transfer to Kentucky, on August 13, 2020, Jordan was charged administratively with Prohibited Act Code 106, Possession of a Hazardous Tool, when he was found in possession of a Micro SD Memory Card, a device capable of storing computer files and images. *See id*. at 6; *see also* DE 1-7 (August 13, 2020 Incident Report). Two weeks later a Disciplinary Hearing Officer ("DHO") found him guilty of the offense, after Jordan admitted his possession of the memory card during a disciplinary hearing. *Id*. The DHO imposed various sanctions, including the loss of good conduct time and a commissary suspension. *Id*.

On September 16, 2020, the facility warden placed an "investigation hold" on Jordan's commissary and phone accounts. *See* DE 1-8 (TRULINCS Account Transactions – Commissary). Jordan believes that the hold was imposed in relation to his then-recent disciplinary conviction. *See* DE 1 at 15-16. Jordan alleges that the hold limited his commissary spending to six dollars per month and was to remain in effect, in theory, until 2035, the year he was scheduled to complete service of his sentence. *See id*. at 15, 18. However, the hold actually was removed 162 days later when Jordan was transferred to the federal prison in Kentucky. *See id*. 19.

In his petition, Jordan asserts two claims arising out of these unrelated events. First, he contends that the BOP violated Article 12 of the UCMJ by housing him in close proximity to foreign nationals throughout the term of his imprisonment. *Id*. at 2. Second, he contends that the BOP violated Article 55 of the UCMJ because the limitation upon his commissary spending amounted to cruel and unusual punishment tantamount to a violation of the Eighth Amendment. *Id*. As explained more fully below, the Court will deny relief on a clear record and under plain standards because Jordan failed to fully and properly exhaust his administrative remedies, because Articles 12 and 55 of the UCMJ do not apply to him, and because his claim under Article 55 is substantively without merit.

**II**

As a threshold matter, Jordan did not exhaust his administrative remedies. Unlike a civilian prisoner, to exhaust administrative remedies before seeking judicial relief, a current or former member of the military who is confined in a non-military facility must show, "absent some unusual or egregious circumstance, that he has exhausted the prisoner grievance system . . . and that he has petitioned for relief under Article 138, UCMJ, 10 U.S.C. § 938." *United States v. Coffey*, 38 M.J. 290 (CMA 1993); *see also United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997); *United States v. White*, 54 M.J. 469, 472-73 (C.A.A.F. 2001); *United States v. Wise*, 64 M.J. 468, 471-73 (C.A.A.F. 2007); *Noyd v. Bond*, 395 U.S. 683, 693 (1969) ("[H]abeas corpus petitions from military prisoners should not be entertained by federal civilian courts until all available remedies within the military court system have been invoked in vain.").

Just as with the exhaustion requirement applicable to federal civilian prisoners, "this administrative exhaustion requirement furthers two related goals: the resolution of the issue at the lowest level and the development of the record for later appellate review." *United States v. Wilson*, 73 M.J. 529, 534 (A.F. Ct. Crim. App. 2014) (citation omitted); *see also Parisi v. Davidson*, 92 S.Ct. 815, 818 (1972) ("The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies.") This administrative exhaustion requirement applies with equal force to Jordan's claims under both Article 12 and Article 55. *See United States v. McPherson*, 73 M.J. 393, 396-97 (C.A.A.F. 2014).

**A.**

With these principles in mind, the Court first considers exhaustion of Jordan's claim that he was confined with foreign nationals in contravention of Article 12. Jordan undertook separate

efforts to exhaust his administrative remedies with military authorities. Shortly after he filed an informal grievance with the BOP regarding his Article 12 complaints, on August 7, 2020, Jordan sent a letter raising the same concerns to the Commandant of the United States Disciplinary Barracks (USDB) in Fort Leavenworth, Kansas. *See* DE 1-20 (Letter to Col. Smith). In his letter, Jordan asserted that he was subject to the UCMJ because he was a "person in custody of the armed forces serving a sentence imposed by a court-martial" within the meaning of Article 2(a)(7) of the UCMJ, 10 U.S.C. § 802(a)(7). *Id*. at 1. He then set forth at length his repeated interactions and activities with various alleged citizens of other countries over the course of his six years of incarceration with the BOP. *Id*. at 2. Jordan identified his letter as one seeking relief under Article 138 of the UCMJ.[3] *See id*. at 4.

On August 31, 2020, the Commandant of the USDB sent a Memorandum to Jordan summarily denying relief, notably concluding that Articles 12 and 138 of the UCMJ did not apply to him. Per that Memorandum:

> 1.  On 24 August 2020 I received your request for redress for complaints of wrong under Article 138 of the Uniform Code of Military Justice concerning violations of Article 12 by the Federal Bureau of Prisons. An Article 138 complaint is available to any member of the armed forces but is not available as an avenue for redress due to your dishonorable discharge from the armed forces on 9 October 2013, as set forth in the Manual for Courts-Martial (2019 Edition) and Army Regulation 27-10, Military Justice, dated May 11, 2016.[4]
>
> 2.  Additionally Article 12 UCMJ is not applicable to you as you are no longer a member of the armed forces, 10 United States Code Section 812 states, "No member of the armed forces may be placed in confinement in immediate association with (1) enemy prisoners ...." You ceased to be a member of the armed forces with your dishonorable discharge on October 9, 2013.

---

[3]  *See* 10 U.S.C. § 938 ("Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon.").

[4]  *See* Army Regulation ("AR") 27-10 § 19-4(a) (Nov. 2020) ("Complaints may only be made by a member of the Armed Forces.").

3.   Your request for redress under Article 138 is denied.

*See* DE 1-21 (Memorandum).

On September 7, 2020, Jordan sent a letter to the Commanding General at Fort Leavenworth. *See* DE 1-22 (Letter to LTG. Lundy). Jordan first stated that he had not received a response from the Commandant at Leavenworth within the permitted 15-day response period and, having waited an additional 15 days, treated the absence of a response as a constructive denial.[5] *See id.* at 1. Jordan repeated the factual allegations and legal arguments nearly *verbatim* from his first letter and requested that his sentence be reduced by 14 years pursuant to the Rules of Court Martial 305(k) ("R.C.M."). *Id* at 1-4. Jordan states that he received no response to this letter. *See* DE 1 at 3, 22. Jordan having, without success, invoked Article 138 with the Commandant of the USDB and further with the Commanding General at Fort Leavenworth, the Court will assume for purposes of screening that he exhausted his administrative remedies with military authorities. *See* AR 27-10 §§ 19-13, 19-14 (Nov. 2020).

Jordan, as noted, was also required to exhaust his remedies available through the BOP's inmate grievance process, set forth at 28 C.F.R. §§542.10-.19. Before filing a formal grievance, the inmate must give prison staff the chance to correct the problem themselves by submitting an Attempt at Informal Resolution . *See* 28 C.F.R. §542.13(a). Independent of informal efforts to resolve the issue, the inmate must file a formal grievance with the warden by filing a Form BP-9 within twenty (20) days of the event being grieved. 28 C.F.R. §542.14(a).

The inmate may request an extension of time to file a grievance or appeal if he "demonstrates a valid reason for delay." *See* 28 C.F.R. § 542.14(b), § 542.15(a). The regulation

---

[5]  *See* AR 27-10 § 19-7(f) (Nov. 2020) ("A Soldier who, through no fault of the Soldier's own, has not received a final response within 15 days (or 60 days from an RC commander), or an interim response containing the date of a final response that does not unreasonably delay the final response, may elect to treat that as a denial of redress.").

identifies several potentially qualifying circumstances, such as "an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal" or an "indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed." *See* 28 C.F.R. § 542.14(b). The regulations note, among other things, that "Exhibits will not be returned with the response. Because copies of exhibits must be filed for any appeal (see § 542.15(b)(3)), the inmate is encouraged to retain a copy of all exhibits for his or her personal records." 28 C.F.R. § 542.14(c)(3). Alternatively, each prison maintains an index of grievances and appeals filed by prisoners as well as responses to them, and copies of these documents may be obtained upon request by inmates and the public. 28 C.F.R. § 542.19. The warden must decide the grievance within twenty (20) calendar days after it is logged as received. *See* 28 C.F.R. § 542.18.

If the inmate is not satisfied with the warden's response, within twenty (20) days after the warden's denial is signed, the inmate must appeal by filing with the Regional Director a Form BP-10, a copy of his BP-9, and a copy of the warden's response to it. 28 C.F.R. § 542.15(a), (b)(1). The regulations prohibit an inmate from raising an issue in an appeal to the Regional Director or General Counsel that was not asserted in lower-level filings. *See* 28 C.F.R. § 542.15(b)(2). The Regional Director must decide the appeal within thirty (30) calendar days. *See* 28 C.F.R. § 542.18.

If the inmate is dissatisfied with the Regional Director's response, within thirty (30) days after the Regional Director's denial is signed, he must appeal by filing with the Office of General Counsel a Form BP-11, as well as copies of his BP-9 and BP-10, and copies of the responses to them from the warden and Regional Director. 28 C.F.R. § 542.15(a), (b)(1). The Office of General Counsel must decide the appeal within forty (40) calendar days. *See* 28 C.F.R. § 542.18.

8

At any level of the process, the grievance coordinator may reject a grievance or appeal if it fails to comply with applicable requirements. *See* 28 C.F.R. § 542.17(a). If the defect can be corrected, the coordinator will advise the inmate of the defect and afford him a reasonable time to remedy the error and resubmit the grievance. *See* 28 C.F.R. § 542.17(b). If no such opportunity is afforded, the prisoner may appeal the rejection. *See* 28 C.F.R. § 542.17(c). If the inmate chooses to appeal a rejection, the coordinator at the appellate level may affirm the rejection, disregard the rejection and accept the submission for filing at the appellate level, directly return the submission to the lower level at which it was rejected, or direct that the submission be accepted at the lower level once the inmate resubmits it there. *Id*

If the BOP warden, Regional Director, or General Counsel decides that additional time is needed to adequately respond to the grievance or appeal, each may extend its time to respond: the warden by twenty (20) days, the Regional Director by thirty (30) days, and the General Counsel by twenty (20) days. *See* 28 C.F.R. § 542.18. If the inmate does not receive a response from the BOP within the time allowed (including any permitted extensions), the prisoner may consider the absence of a response to be a denial at that level. *See* 28 C.F.R. § 542.18.

Jordan indicates that he was incarcerated with numerous citizens of foreign countries, whom he recalls in great detail, since mid-2014. But Jordan did not file his initial informal grievance regarding his Article 12 claim until July 16, 2020, when he was confined at the federal prison in Petersburg, Virginia. *See* DE 1-13 (Administrative Remedy Attempt). Jordan attributes the delay not to any unawareness that his confederates were foreign-born, but to his lack of "understanding of the legal significance of being confined with foreign nationals." *See* DE 1 at

20.[6] In his grievance Jordan alleged that Wilfredo Villeda, his most recent cell mate, was an illegal immigrant, and demanded 98 days of credit against his sentence, which is one day of credit for each day they shared a cell. *Id*. Staff denied the grievance two weeks later, noting that under BOP Program Statement 5110.16 "military inmates transferred to BOP custody are subject to the same treatment as other BOP inmates." *Id*.

Jordan filed his first formal grievance with the warden on August 11, 2020. *See* DE 1-14 (Request for Administrative Remedy). In this grievance Jordan vastly expanded the scope of his claim, asserting that he had been housed with foreign nationals since his arrival in BOP custody in May 2014. *Id*. at 2. Jordan demanded at least 12 years of credit against his sentence—now two days for each day during the preceding six years of BOP incarceration—and continuing until the asserted violation was remedied. *Id*. Even assuming Jordan's grievance arose on July 16, 2020, instead of six years earlier in July 2014 when he first became aware that he was housed with foreign nationals, it was still untimely. *See* 28 C.F.R. § 542.14(a) (requiring grievance to be filed with warden within 20 days of the event complained of). However, the warden did not deny the grievance on this ground. Instead, the warden denied Jordan's grievance on September 19, 2020, asserting that no violation of Article 12 had occurred because Jordan "[had] not been housed with an individual who is detained under the law of war." *See* DE 1-15 (Response to Request for Administrative Remedy).

Two days later, Jordan appealed to the Mid-Atlantic Regional Office ("MARO"). *See* DE 1-16 (Regional Administrative Remedy Appeal). Notably, in his appeal Jordan stated that for the

---

[6] As this matter is before the Court upon initial screening, the Court accepts this factual assertion for purposes of discussion. The Court notes, however, that Article 137 of the UCMJ expressly requires that many of its provisions, including Article 12, must be "carefully explained to each enlisted member" once within 14 days after the member begins active duty, and a second time after six months of active duty. A similar requirement applies to officers. 10 U.S.C. §§ 937(a), (b).

asserted Article 12 violation he wished to seek sentence credits from the Army, not from the BOP.[7]
*Id*. He further asserted, without explanation or authority, that the 2019 amendments to Article 12,
which limited the prohibition against commingling to foreign nationals "who are detained under
the law of war," did not apply to him because he was referred to court-martial prior to the
amendment's effective date on January 1, 2019. *Id*. MARO denied Jordan's appeal on March 6,
2021, again stating that "you have not been housed with an individual who is detained under the
law of war." *See* DE 1-17 (Response to Regional Administrative Remedy Appeal). Jordan received
MARO's denial on March 25, 2021.

Jordan did not sign his appeal to the BOP's Central Office until May 14, 2021, fifty (50)
days after his receipt of MARO's denial. *See* DE 1-18 (Central Office Administrative Remedy
Appeal). In his appeal Jordan explained that "my response is untimely because Region did not
return my original documentation. I received an incomplete photocopy." *Id*. Jordan also then
conceded that Article 12 was not violated once it was amended effective January 1, 2019, arguing
instead that "a change in law is not retro active (*sic*) and does not remove the fact the violations
occurred from August 2014 until January 2019." *Id*. Jordan repeated that what he sought from the
BOP was an admission that it had violated Article 12, not a remedy. *Id*. The Central Office issued
a rejection notice on June 15, 2021, indicating that it was rejecting Jordan's appeal because it was
untimely. *See* DE 1-19 (Central Office's Rejection Notice). The notice stated that "Central Office
appeals must be received within 30 days of the Regional Director's response. This time limit
includes mail time." *Id*. Jordan took no further steps with respect to this appeal to the BOP.

---

[7] Jordan stated that "The Warden's BP-9 response is incorrect. I actually requested that 'the FBOP comply with Article 12 and that the FBOP contact the Commandant of the USDB pursuant to the provision of the MOA and inform her of the acknowledgment of the violations so that proper action (2-for-1 credit) can be taken on behalf of the U.S. Army.' I did not request 'a day for a day Administrative Credit for every I was celled with an illegal immigrant.' *** I have found no case law, nor do I believe any exists that suggests non-military members (FBOP personnel) must enforce the Uniform Code of Military Justice." *See* DE 1-16 at 1-2.

Because the Central Office properly rejected Jordan's appeal as untimely, a fact Jordan conceded in the appeal itself, he failed to exhaust his administrative remedies fully and properly with respect to his claim under Article 12. It is long-established that a prisoner must follow the administrative remedy process in full "compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). And proper exhaustion "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id*. at 2385. (citing *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Jordan deprived the BOP of that opportunity by filing an untimely appeal, and then abandoning the process altogether. This he may not do. *See Scott v. Ambani*, 577 F.3d 642, 647 (6th Cir. 2009) ("*Woodford* makes clear that a prisoner cannot satisfy the PLRA exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance.").

This outcome inflicts no injustice upon Jordan. As noted above, BOP regulations provide multiple avenues for a prisoner to seek an extension of time or other relief to ensure timely filing. Jordan alleged that his "response is untimely because Region did not return my original documentation. I received an incomplete photocopy." *See* DE 1-18. But prison officials are not obligated to return submissions and do not do so as a matter of course. For this and other reasons, the regulations expressly advise inmates to keep copies of their grievances and appeals as well as responses to them. *See* 28 C.F.R. § 542.14(c)(3). If Jordan failed to do so and thus lacked the necessary copies, he could have filed a request for an extension of time to file his appeal. *See* 28 C.F.R. § 542.15(a). Alternatively, he could have filed a timely appeal to the Central Office without the necessary copies, along with a request for an extension of time to remedy the defect. After all,

an indication "verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed" is expressly listed as possible grounds for an extension. *See* 28 C.F.R. § 542.14(b). Jordan availed himself of none of these avenues for relief. Having failed to properly exhaust administrative remedies or make any effort, let alone a diligent one, to remedy his untimely filing, the Court finds no equitable grounds to excuse the exhaustion requirement.

Jordan argues that he should be excused from the exhaustion requirement on grounds of futility. *See* DE 1 at 20. He first contends that the denial by the warden and MARO each constitute "a strong position on the issue together with an unwillingness to reconsider." *Id*. at 21 (*quoting Colton v. Ashcroft*, 299 F. Supp. 2d 681, 690 (E.D. Ky. 2004)). This argument is without merit. Futility is a   narrow exception and has rarely been found even where an agency has formally indicated through a promulgated regulation or internal policy document that it has decided the issue in question or that it will not reconsider its position if challenged in future cases. *See Ciocchetti v. Wiley*, 358 F. App'x 20, 24 (10th Cir. 2009); *c.f. Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 239 (3d Cir. 2005). And validating the expansive view of futility Jordan proposes in this case would eviscerate the requirement of complete exhaustion, permitting a prisoner to entirely forgo appeal to the Central Office based only upon a denial of his grievance on initial consideration by the warden or intermediate appeal to the Regional Office. *See Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999) ("[A]n inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so because his grievance is now time-barred under the regulations.") (citing *Wright v. Morris*, 111 F.3d 414, 417 n.3 (6th Cir.), *cert. denied*, 522 U.S. 906, 118 S. Ct. 263, 139 L.Ed.2d 190 (1997)).

Jordan alternatively argues that exhaustion would be futile because the BOP cannot grant him the shortened, indeed vitiated, sentence that he seeks.[8] *See* DE 1 at 23. But the Supreme Court has rejected the notion that exhaustion is not required if administrative review cannot provide the exact species of relief sought by the petitioner. *See Booth v. Churner*, 121 S. Ct. 1819, 1824 (2001) (holding that "statutory history [] confirms the suggestion that Congress meant to require procedural exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible."); *see also Hartsfield*, 199 F.3d at 308 ("[A]lthough it may make sense to excuse exhaustion of the prisoner's complaint where the prison system has a flat rule declining jurisdiction over such cases, it does not make sense to excuse the failure to exhaust when the prison system will hear the case and attempt to correct legitimate complaints, even though it will not pay damages."). Undoubtedly, thought, prospective housing is within BOP control.

And like his first futility argument, Jordan's second justification would require Court to disregard another long-established principle of exhaustion: that military personnel confined in a civilian facility must exhaust administrative remedies in both civilian and military systems. As Jordan himself has repeatedly noted, only the military courts have authority to grant relief from a sentence imposed by court-martial for an asserted violation of Articles 12, 13, or 55 pursuant to Article 66(d), (e) of the UCMJ. But, the military appellate courts have nonetheless consistently required exhaustion with the local facility and denied relief where the military detainee failed to exhaust. *Cf. United States v. Lemburg*, No. ACM 39261, 2018 WL 4440397, at *4-5 (A.F. Ct. Crim. App. Aug. 30, 2018); *United States v. Damm*, No. ACM 39399, 2019 WL 2896111, at *4 (A.F. Ct. Crim. App. June 21, 2019).

---

[8] Calling into question why the case is postured against the Warden to begin with.

For stated reasons, Jordan failed to administratively exhaust his Article 12 claim with the BOP, and the Court will deny relief on that basis.

## B.

Jordan's grievances regarding his claim under Article 55 followed a parallel path. On October 22, 2020, Jordan sent a letter to the Commandant of the USDB in Fort Leavenworth, Kansas regarding the commissary restriction. *See* DE 1-32 (Letter to Col. Johnston). In an evident rebuttal to the Commandant's denial of his previous Article 138 complaint, Jordan asserted that notwithstanding his dishonorable discharge, he remained a "member of the armed forces" entitled to invoke Article 138. *See id.* at 1. He further contended that the spending limitations imposed by the warden amounted to "financial flogging on a daily basis" in asserted violation of Article 55's prohibition on cruel and unusual punishment, as well as a violation of his right to due process. *Id.* at 3. On November 9, 2020, the Commandant again rejected Jordan's attempt to invoke Article 138. *See* DE 1-33 (Col. Johnston's Rejection). The Commandant explained:

> 1. As provided to you previously, due to lawful execution of your punitive discharge and subsequent issuance of your DD 214 separating you from your Service, you are not a "Member of the Armed Forces" as provided in the UCMJ, Article 2(a)(1) and by definition are therefore ineligible to use the procedures contained in the UCMJ, Article 138 and Chapter 19, AR 27-10. Per the UCMJ, Article 2(a)(7), you nonetheless remain subject to the UCMJ until full satisfaction of your adjudged punishment, to include expiration of sentence. While you remain accountable to the Department of Army by the USDB per the MOA you referenced, the same MOA clearly provides you "remain subject to all FBOP administrative and institutional policies and procedures" while confined in their facility. Therefore, I strongly recommend you comply with BOP rules for discipline and use the published appeal and/or grievance system should you feel a disciplinary action was wrongly undertaken or you have issues concerning institutional rules and procedures.

*Id.* at 1.

On December 7, 2020, Jordan sent a letter to the Commanding General at Fort Leavenworth. *See* DE 1-34 (Letter to LTG Lundy). Jordan first contended that he remained subject

15

to the UCMJ notwithstanding his dishonorable discharge because was a "person in custody of the armed forces serving a sentence imposed by a court-martial" as set forth in Article 2(a)(7) of the UCMJ. *Id*. at 1. He then repeated the same arguments for substantive relief set forth in his first letter, and requested that his sentence be reduced by 5 years or more. *Id*. at 1-6. Jordan states that he received no response to this letter. *See* DE 1 at 3.

As it did with his first claim, the Court assumes without deciding that Jordan's unsuccessful attempt to seek relief under Article 138 from the Commandant of the USDB and the Commanding General at Fort Leavenworth indicates administrative exhaustion with military authorities regarding, and as a predicate for, his Article 55 claim.

Jordan's efforts with the BOP, however, were ultimately insufficient. On September 16, 2020, Jordan filed his initial informal grievance regarding the encumbrance placed on his inmate account earlier the same day, complaining that the warden's action violated his due process rights. *See* DE 1-23 (Attempt at Informal Resolution). Jordan requested that the restriction on his account be terminated. *Id*. at 1. Staff denied the grievance the next day, directing him to file a formal grievance with the warden. *Id*.

Jordan's initial grievance was due on October 6, 2020. *See* 28 C.F.R. § 542.15(a). Jordan signed his formal grievance with the warden on October 7, 2020, contending that the commissary spending restriction was not an available sanction for the disciplinary conviction upon which he believed it was based, violated his due process rights, and amounted to cruel and unusual punishment. *See* DE 1-24 (Request for Administrative Remedy). On October 19, 2020, the administrative remedy coordinator at the prison rejected Jordan's grievance as untimely. *See* DE 1-25 (Rejection Notice – Administrative Remedy). The rejection notice indicated that Jordan's grievance was not received until October 19, 2020, and relayed that "institution and CCC requests

(BP-09) must be received w/20 days of the event complained about." *Id*. After the rejection, Jordan did not invoke the procedures previously identified in an effort to either explain to the institutional remedy coordinator why his grievance was untimely or to seek an extension of time to file. However, because the coordinator did not afford Jordan a chance to remedy the defect, Jordan was entitled to appeal the rejection itself, although not the issue underlying his grievance. *See* 28 C.F.R. § 542.17(c).

On October 27, 2020, Jordan mailed his appeal to MARO. *See* DE 1-28 (Regional Administrative Remedy Appeal). In his appeal, Jordan alleged that he had sent an e-mail to the prison remedy coordinator requesting additional time to file his grievance with the warden but had received no response. *Id*. He did not provide any documentation regarding this communication. Jordan repeated his contention that the commissary spending restriction violated his rights under the Fifth and Eighth Amendments. *Id*. at 2. Jordan later provided a letter stating that the facility was on COVID-19 lockdown from September 28, 2020 until October 5, 2020. *See* DE 1-27 (Nov. 19, 2020, BOP letter).

On December 4, 2020, MARO's remedy coordinator rejected Jordan's appeal on two grounds. *See* DE 1-29 (Rejection Notice – Administrative Remedy). First, MARO indicated that Jordan's appeal was untimely, noting that "Regional Appeals (BP-10) must be received within 20 days of the Warden/CCM response ..." *Id*. Taken at face value, MARO's coordinator was plainly incorrect: MARO had received Jordan's appeal on November 1, 2020, only thirteen days after the institutional remedy coordinator had rejected Jordan's grievance. The regional appeal was therefore, in fact, timely. *See* 28 C.F.R. § 542.15(a). However, viewed in light of the coordinator's direction immediately following to "provide staff verification stating reason untimely filing was not your fault," the coordinator's reference to untimeliness appeared to relate to Jordan's initial

filing at the institutional level. In his subsequent appeal to the Central Office, Jordan volunteered

that this was a plausible interpretation of the coordinator's comments. *See* DE 1-30 at 2 (Central

Office Administrative Remedy Appeal). Second, MARO stated that Jordan had not included a

copy of his initial appeal to the warden or a copy of the warden's response. *See* DE 1-29 at 1. In

his later appeal to the Central Office, Jordan alleged that this was simply not true. *See* DE 1-30 at

2. While MARO rejected Jordan's appeal, it directed him to resubmit his appeal in proper form

within 10 days. *See* DE 1-29 at 1. Jordan would later state that once he received MARO's rejection

notice on December 15, 2020, he resubmitted his appeal to MARO two days later. Jordan alleged

that on January 22, 2021, MARO again rejected his appeal on unspecified grounds, this time

without leave to resubmit.  Assuming this to be true, Jordan was permitted to appeal the rejection

to the Central Office. 28 C.F.R. § 542.17(c).

Jordan filed his Central Office appeal on February 3, 2021. *See* DE 1-30 at 1. Substantively,

Jordan's appeal repeated his contention that the administrative hold on his commissary account

was unconstitutional, and he requested that it be terminated. *Id*. at 1-2. The BOP's Central Office

rejected Jordan's appeal on March 5, 2021, stating that Jordan should have filed his request at his

institution, and "if staff provide a memo stating the late filing was not your fault, then re-submit

to the level of the original rejection." *See* DE 1-31 (Rejection Notice – Administrative Remedy).

Jordan states that he took no further steps with respect to this appeal to the BOP because he "had

already transferred to FCI Ashland and could not resubmit his appeal to the Warden of FCC

Petersburg Low." *See* DE 1 at 22-23.  By that point, the restriction had ended anyway.

Jordan essentially acknowledges that he did not properly exhaust administrative remedies

but complains that prison officials should have been more flexible in their application of the rules,

including filing deadlines, and asks the Court to excuse technical noncompliance on grounds of

futility. *Id*. However, Jordan repeatedly and inexplicably failed or refused to take advantage of the numerous identified mechanisms, available to him at each level of the grievance process, to ensure acceptance of his grievance so that it could be reviewed upon its merits. At the outset, Jordan could have requested an extension of time from the warden to file his grievance by noting the lockdown at the prison. *See* 28 C.F.R. § 542.14(b) (noting that an extension may be warranted by "an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal"). He did not do so. Instead, Jordan bypassed the warden's initial review of his grievance, and delayed presentation of his grounds justifying the initial dilatory filing for presentation to MARO in the first instance.

To be sure, MARO's rejection of Jordan's initial appeal was at best ambiguous and at worst simply incorrect. Further, Jordan responded properly by first addressing its objections and then appealing MARO's second denial. However, Jordan again failed to comply with the Central Office's direction to re-submit his grievance at the institutional level with the staff memo he had already provided to MARO. *See* 28 C.F.R. § 542.17(b). This would have placed a timely merits question into the administrative process. Further, Jordan is incorrect as a matter of law when he asserts that his transfer to a different federal prison prevented him from (or justified not) resubmitting his grievance at the institutional level. *See Napier v. Laurel County*, 636 F.3d 218 (6th Cir. 2011) (citing *Blakey v. Beckstrom*, No. 06-163-HRW, 2007 WL 205005, at *2 (E.D. Ky. Jan. 24, 2007)) ("Generally, '[t]he transfer of a prisoner from one facility to another does not render the grievance procedures at the transferor facility unavailable for purposes of exhaustion.'"). And BOP rules indicate that the proper location to file a grievance appeal is determined based upon the location of the inmate's confinement at the time of filing. *See* BOP Program Statement 1330.18 § 9(c) ("The appropriate regional office to process the Appeal is the regional office for the

19

institution where the inmate is confined at the time of mailing the Appeal, regardless of the institution that responded to the institution filing."). The same approach logically attaches to a resubmitted institutional grievance following an inmate's transfer.

Jordan's abandonment of the grievance process at the Central Office level resulted in his failure to fully and properly exhaust administrative remedies. Courts have consistently held that a prisoner's failure or refusal to correct readily curable defects during the grievance process constitutes an abandonment of the grievance process, not its completion. *Cf. Lee v. Benuelos*, 595 F. App'x 743, 746-47 (10th Cir. 2014) (holding that claims were unexhausted where prisoner disregarded Central Office's direction to re-file grievance with institution); *Boyd v. United States*, 396 F. App'x 793, 796 (3d Cir. 2010); *Thornton v. Daniels*, 554 F. App'x 762, 766-67 (10th Cir. 2014); *Cantrall v. Chester*, 454 F. App'x 679, 680-81 (10th Cir. 2012). This Court has adhered to the rule. *See Arzate-Miranda v. Farley*, No. 7: 11-CV-116-KKC, 2015 WL 520557, at *5 (E.D. Ky. Feb. 9, 2015) ("A rejection of an administrative remedy is not the same as the BOP having ruled on the merits of an administrative remedy. A prisoner's failure either to complete the exhaustion of administrative remedies and/or to cure the deficiencies with his administrative remedies constitutes a failure to exhaust."); *see also Odom v. Helton*, No. 0: 12-80-HRW, 2013 WL 4012889, at *8 (E.D. Ky. Aug. 6, 2013); *Campbell v. Patton*, No. 0: 07-71-HRW, 2008 WL 559681, at *2 (E.D. Ky. Feb. 27, 2008).

The Supreme Court's discussion of the means and ends of the exhaustion requirement is worthy of repetition here:

> Statutes requiring exhaustion serve a purpose when a significant number of aggrieved parties, if given the choice, would not voluntarily exhaust. Aggrieved parties may prefer not to exhaust administrative remedies for a variety of reasons. Although exhaustion promotes overall efficiency, a party may conclude—correctly or incorrectly—that exhaustion is not efficient in that party's particular case. In addition, some aggrieved parties may prefer to proceed directly to federal court for

20

> other reasons, including bad faith. . . . Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).

*Woodford*, 126 S. Ct. at 2385 (internal citations omitted). Jordan pursued completion of a grievance round, but did not do so properly or completely. The Supreme Court has squarely held that "exhaustion *simpliciter*" is not enough. *Woodford*, 126 S. Ct. at 2384. The Court will therefore deny relief with respect to Jordan's claim for relief under Article 55 in light of his failure to administratively exhaust it prior to filing suit.

III

Now alternatively, and on the merits: independent of whether Jordan exhausted his administrative remedies, he is not entitled to invoke the provisions of the UCMJ. This is true with respect to his claims under both Article 12 and Article 55, albeit for slightly different reasons.

As noted above, when Jordan filed an Article 138 complaint with USDB regarding his Article 12 claim, the Commandant denied relief not on the merits, but because Jordan's dishonorable discharge in 2013 meant he was no longer a "member of the armed forces." *See* DE 1-21. Without that status, Jordan was not entitled to the substantive housing protection set forth in Article 12 or the right to invoke the procedures set forth in Article 138 to complain of its asserted breach. *Id*. As explained more fully below, the Court concurs with this analysis, and the issue is fatal to the claim.

When Jordan filed his Article 138 complaint stating an asserted violation of Article 55, the Commandant denied the grievance on only a procedural ground--that Jordan's dishonorable discharge terminated his status as a member of the armed services, precluding his invocation of

21

Article 138.[9] However, the Commandant further asserted that "Per the UCMJ, Article 2(a)(7), you nonetheless remain subject to the UCMJ until full satisfaction of your adjudged punishment, to include expiration of sentence." *See* DE 1-33. If so, Article 55 might apply to Jordan because, unlike Article 12, it applies not just to members of the armed forces but to "any person subject to this chapter." 10 U.S.C. § 855. In this regard the Court's analysis differs from the Commandant's, and the Court ultimately concludes that Jordan is not subject to the UCMJ pursuant to Article 2(a)(7).

The UCMJ is set forth in Chapter 47 of Title 10 of the United States Code. The UCMJ broadly encompasses the administration of military justice, including the delineation of criminal offenses, 10 U.S.C. §§ 877-934; the arrest and detention of those charged with military crimes, 10 U.S.C. §§ 807-14; the types of courts-martial, their composition, and the rules applicable to the prosecution of criminal offenses, 10 U.S.C. §§ 822-54, as well as punishments that may be imposed and procedures for appellate review, 10 U.S.C. §§ 855-876b, 941-946a.

The UCMJ establishes a system of justice parallel to Article III courts. Notably, "because persons subject to trial by courts-martial are not afforded some of the Constitutional rights which are normally recognized in Article III courts, the Supreme Court has cautioned that the authority to convene a court-martial must be limited to 'the least possible power adequate to the end proposed.'" *United States v. Ali*, 70 M.J. 514, 519 & n.10 (A. Ct. Crim. App. 2011), *aff'd*, 71 M.J. 256 (C.A.A.F. 2012) (*quoting United States ex rel. Toth v. Quarles*, 76 S. Ct. 1, 8 (1955)).

---

[9]  The Commandant responded to Jordan, stating that "you are not a 'Member of the Armed Forces' as provided in the UCMJ, Article 2(a)(1) ..." *See* DE 1-33.  However, Article 2(a) and its subdivisions do not define "member of the armed forces." That term is only referenced in Article 2(b), which states that a civilian becomes a member of the armed forces and hence subject to jurisdiction under Article 2(a) upon validly taking the oath of enlistment. For its part, Article 2(a)(1) includes as subject to the UCMJ "members of a regular component of the armed forces ..."

The reach of the UCMJ is  limited in scope and terms to those persons subject to its provisions. Article 2 sets forth in considerable detail the persons subject to the UCMJ. That coverage predictably extends to active-duty military personnel, but further applies to an assortment of other categories, including some retired members of the military, certain prisoners of war, and identified categories of federal employees working with the military. *See* 10 U.S.C. § 802(a)(1), (a)(4), (a)(8), (a)(9). Jordan contends that he may assert his claims in light of Article 2(a)(7), which subjects to the UCMJ "persons in custody of the armed forces serving a sentence imposed by a court-martial." 10 U.S.C. § 802(a)(7).

But a person merely "subject to" the UCMJ as a general matter under Article 2 does not automatically become subject to (or conversely, entitled to invoke the protection of) every other Article or provision of the UCMJ. For example Article 13, an Article not at issue in this case, applies to any "person" being held for trial. 10 U.S.C. § 813 ("No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, ..."). This provision, through its application to any "person," may extend beyond those "subject to" the UCMJ under Article 2.

Compare that language with the narrower scope of Article 55, which applies to "any person subject to this chapter." 10 U.S.C. § 855 ("Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by any court-martial or inflicted upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited."). The phrase "person subject to this chapter" is functionally identical to that of Article 2(a). 10 U.S.C. § 802(a) ("The following persons are subject to this chapter..."). But Article 12's scope is narrower still and more particular; it prohibits, in its current form, placing only a "member of the armed forces" in proximity to foreign nationals

23

of prisoners of war. 10 U.S.C. § 812 ("No member of the armed forces may be placed in confinement in immediate association with - (1) enemy prisoners; or (2) other individuals - (A) who are detained under the law of war and are foreign nationals; and (B) who are not members of the armed forces."[10] Article 12 therefore plainly does not apply to every person subject to the UCMJ under Article 2.  The pre-2019 version likewise applied to a confined "member of the armed forces."  § 812 (in effect until December 31, 2018).

Jordan's claim under Article 12 therefore fails because, even assuming he is subject to the UCMJ under Article 2, he is not and has not since BOP confinement been a "member of the armed forces." As noted above, Jordan's dishonorable discharge was executed on October 9, 2013. *See In Re Jordan*, 80 M.J. at 608. Under 10 U.S.C. § 876, Jordan's sentence including his dishonorable discharge became final once it was "carried into execution … following approval, review, or affirmation[.]" Administratively, this involved execution of a DD Form 214 (Armed Forces of the United States Report of Transfer or Discharge) and finalization and adjustment of pay and benefits. 10 U.S.C. § 1168(a) ("A member of an armed force may not be discharged or released from active duty until his discharge certificate or certificate of release from active duty, respectively, and his final pay or a substantial part of that pay, are ready for delivery to him or his next of kin or legal representative."). Because Jordan's sentence included a dishonorable discharge, that portion of his

---

[10] Prior to its amendment in 2016, with an effective date on January 1, 2019, Article 12 provided that "No member of the armed forces may be placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces."  Jordan claims that this version applied to him for the first five years of his BOP confinement.  He also *tries* to claim that it continues to govern him now, despite the clear change in law in 2019.  He does not contend that he has ever been housed with a foreign national "detained under the law of war."  He offers no authority to suggest that the housing restriction in effect until 2019 would somehow remain a source of regulation after its supersession.  The Court assumes that a foreign national is a "national," *i.e.*, one owing allegiance to a country, other than the United States.  *See* 8 U.S.C.A. § 1101(21)("The term 'national' means a person owing permanent allegiance to a state.").  The scope of Article 12 governed only a "member of the armed forces" both in the prior and current versions.

sentence was "executed and took effect" upon the completion of appellate review and approval of dismissal by the appropriate Secretary. *See* 10 U.S.C. § 857(a)(4), (5).[11]

Once Jordan's dishonorable discharge had been effected, he was no longer a "member of the armed services" entitled to invoke Article 12. *See* DE 1-21 ("You ceased to be a member of the armed forces with your dishonorable discharge on October 9, 2013."); *In Re Jordan*, 80 M.J. at 606, 609 (characterizing Jordan as a "former Service Member" and stating that "Petitioner's dishonorable discharge has been executed and the appellate courts have rendered a final judgment as to the legality of the proceedings, satisfying Article 71(b) and (c)(1), UCMJ, and rendering his case final under Article 76."); *see also Quarles*, 76 S. Ct. at 3 & n.8 ("It has never been intimated by this Court, however, that Article I military jurisdiction could be extended to civilian ex-soldiers who had severed all relationship with the military and its institutions."); *United States v. Brown*, 31 C.M.R. 279, 280 (1962) ("... under long standing service precedents, delivery of a discharge certificate operated to terminate the accused's status as a member of the Air Force ...").

Once Jordan's status as a service member was terminated, Article 12 ceased to apply to him.  The military courts have expressly and unfailingly held that Article 12 does not apply to former members of the military after their discharge from service:

> Article 12, UCMJ, applies only to "member[s] of the armed forces." Although Article 58(a) expressly permits confinement of military members outside of military custody prior to the execution of a discharge, the execution of such a discharge severs not only their status as members of the armed forces, but also, unlike members serving confinement in military custody, ends their being subject to the code. See Article 2(a)(7), UCMJ, 10 U.S.C. 802(a)(7). Once a military member is no longer subject to the code, the statutory protections of Article 12, UCMJ, no longer apply. In the present case, the appellant was still subject to the code awaiting appellate review of his case when he was segregated for the evidenced reason of preventing an Article 12, UCMJ, violation.

---

[11]  During Jordan's court-martial proceedings the pertinent language was found in 10 U.S.C. § 871 (2012), but "the same requirements and nearly identical language is found in this renumbered section." *In Re Jordan*, 80 M.J. at 608 n.15.

*United States v. Wilson*, 73 M.J. 529, 533-34 (A.F. Ct. Crim. App.), *aff'd*, 73 M.J. 404 (C.A.A.F. 2014). While Jordan cites numerous cases where Article 12 has applied and sentence relief has been considered, *see* DE 1 at 12-15, every one of those cases (and every one of several dozen more reviewed by the Court in its research) were pending before military courts, not civilian ones. They also involved confinement of military personnel who had not yet been discharged, and hence remained members of the armed forces seeking sentence relief under Article 66[12] prior to conviction and sentence finality. None of these cases involved former service members and post-discharge confinement, let alone any confined in a BOP facility.[13] Because Jordan's dishonorable discharge terminated his status as a "member of the armed forces," Article 12, UCMJ simply does not apply to him.

Jordan's claim under Article 55 requires a different analysis. The pertinent language of that Article states that "... cruel or unusual punishment [] may not be adjudged by any court-martial or inflicted upon any person subject to this chapter." 10 U.S.C. § 855. Article 2(a), in turn, includes as a "person subject to this chapter" any person "in custody of the armed forces serving a sentence imposed by a court-martial." 10 U.S.C. § 802(a)(7). Jordan is plainly serving a sentence imposed by court-martial, and he argues at length that he is also in the  custody of the armed forces. For instance, he includes the 1994 Memorandum of Agreement between the Department of the Army and the BOP under which the BOP agreed to house 500 military prisoners for the Army. *See* DE

---

[12] The military appellate courts' authority to grant sentence relief derives from Article 66(c)-(e) of the UCMJ. *Cf.* 10 U.S.C. § 866(d)(1)(A) ("The Court may affirm only the sentence, or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved."); *United States v. Gay*, 75 M.J. 264, 268 (C.A.A.F. 2016).

[13]  This makes sense.  After all, the 1994 Memorandum of Agreement under which the Department of the Army transferred military prisoners into BOP custody for service of their military sentences expressly provided that "[t]hose prisoners transferred, unless otherwise specifically approved by DA, will have been formally discharged from their respective Service." *See* DE 1-1 (1994 Memorandum of Agreement, § 4(d)). Jordan is no exception to this standard.

1-1 (1994 Memorandum of Agreement). Jordan asserts that "the Memorandum states that military prisoners within BOP facilities remain 'in permanent custody of the U.S. Army.'" *See* DE 1 at 7. But that is not what the 1994 Memorandum actually says. Instead, it states that "[t]he term 'military prisoner' as referred to in this agreement, refers to all military prisoners, regardless of Service affiliation, in permanent custody of the U.S. Army." *See* DE 1-1 at 2.[14] The context in which the phrase "permanent custody" is used in the 1994 Agreement plainly refers to legal, rather than physical, custody. After all, pursuant to the 1994 Memorandum, the Army transferred physical custody over the referenced military prisoners to the BOP for execution of their sentences.[15]

The question then is whether Article 2(a)(7) requires the person "serving a sentence imposed by a court-martial" to be in the "custody of the armed forces" in the legal sense or in the physical sense. The word "custody" alone does not answer the question, as its meaning varies depending upon the context in which it is presented. *See Rumsfeld v. Padilla*, 542 U.S. 426, 438-42 (2004); *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 494-95 (1973). The military courts have concluded that Article 2(a)(7)'s reference to custody means *physical* custody. Thus, military personnel serving a sentence imposed by a court-martial are in the "custody of the armed forces" for purposes of Article 2(a)(7) when they are in a military prison, not a civilian one:

> Although Article 58(a) expressly permits confinement of military members outside of military custody prior to the execution of a discharge, the execution of such a discharge severs not only their status as members of the armed forces, but also,

---

[14] Before his discharge, Jordan was an officer in the Navy. However, pursuant to agreement between the service branches the Department of the Army administers custodial sentences for all branches. *Cf. Johnson v. O'Brien*, No. 7:09CV00504, 2010 WL 2927976, at *1 (W.D. Va. July 23, 2010) ("The USDB is a maximum security correctional facility maintained by the Army Corrections System that 'provides long-term incarceration for military prisoners for all services.' Army Reg. 190–47 § 2–2.").

[15] The Agreement recognizes "custody of the FBOP," though it leaves clemency to the service branches. The current description of the arrangement is in the BOP Program Statement 5110.16. It confirms that sentence computation remains with the military, but that military inmates "*transferred to Bureau custody* are subject to the same treatment and discipline as other Bureau inmates." *See id.* (emphasis added). This, indeed, is the law under 10 U.S.C. § 858. That statute recognizes that military inmates may be housed in federal facilities "not under the control of one of the armed forces" and that such persons are subject to the same discipline and treatment as others, non-military, confined in such facilities. *See id.*

*unlike members serving confinement in military custody*, ends their being subject to the code. See Article 2(a)(7), UCMJ, 10 U.S.C. 802(a)(7).

*Wilson*, 73 M.J. at 533-34 (emphasis added); *see also United States v. Begani*, 79 M.J. 767, 775 n. 53 (N-M. Ct. Crim. App. 2020) (*en banc*), *aff'd*, 81 M.J. 273 (C.A.A.F. June 24, 2021) ("Under Article 2(a)(7), military prisoners, even after they receive their DD-214s (Certificate of Discharge from active duty), are subject to the Code *if they are still in a military brig serving a sentence imposed by a court-martial.*") (emphasis added); *United States v. Guinn*, 81 M.J. 195 (C.A.A.F. 2021); *United States v. Gurganious*, 36 M.J. 1041, 1042 (N-M. C.M.R. 1993) ("Therefore, as soon as the appellant's discharge is executed and he is released from confinement *in an armed forces confinement facility*, he will lose his status as a person subject to the UCMJ and any suspended punishments will be remitted.") (emphasis added), *review denied*, 45 M.J. 13 (C.A.A.F. June 20, 1996); *United States v. Goins*, No. NMCM 94 01498, 1995 WL 935044, at *1 (N-M. Ct. Crim. App. Nov. 2, 1995) ("Discharge from the Navy and permanent release from post-trial confinement terminates the appellant's status as being subject to the UCMJ  and results in automatic remission of all suspended portions of a sentence."), *aff'd*, 46 M.J. 115 (C.A.A.F. Sept. 18, 1996).

Similarly, civilian courts have concluded that a former military member is yet subject to the UCMJ under Article 2(a)(7), whether for purposes of court-martial jurisdiction over offenses committed during incarceration or asserting conditions of confinement claims, when the petitioner is confined in a military institution. *Cf. Ricks v. Nickels*, 295 F.3d 1124, 1130-31 (10th Cir. 2002) (*citing Kahn v. Anderson*, 255 U.S. 1, 8-9 (1920)); *Ragan v. Cox*, 320 F.2d 815, 816-17 (10th Cir. 1963); *Walden v. Bartlett*, 840 F. 2d 771, 773 (10th Cir. 1988)); s*ee also Chapman v. Warden, FCC Petersburg-Medium*, No. 1:21CV535 (LO/TCB), 2022 WL 16922473, at *5 (E.D. Va. Nov. 10, 2022) (concluding that Article 2(a)(7) authorized court-martial of discharged former member for murder he committed while confined at USDB and noting: "Chapman does not point to a single

case in which a federal court has demanded a service connection for a court-martial to preside over criminal proceedings initiated against a former servicemember who committed the crime *while in the military's carceral custody* for a crime committed as an active servicemember") (emphasis in original). Therefore, because Jordan is in the physical custody of the BOP, he is not in the "custody of the armed forces" within the meaning of Article 2(a)(7). He is therefore not a person "subject to the code" for purposes of Article 55, and may assert no claim based upon it. Jordan's claim under Article 55 will therefore be denied.[16]

## IV

Finally, the Court concludes that Jordan's claim under Article 55 is substantively without merit. Jordan asserts that the restriction imposed, which encumbered his funds (for the commissary and phone) and limited his spending at the commissary to six dollars each month, was unauthorized,[17] disproportionate to his disciplinary offense, and cruel and unusual punishment. *See* DE 1 at 15-19.

---

[16] The Court carefully toured cases that Jordan cites as indicating that the scope of § 2(a)(7) might extend to military prisoners housed within federal, non-military prisons. The Court finds that none of those cases supports the theory that Jordan remained subject to the UCMJ for purposes of § 855 rights. *United States v. Joshua*, 607 F.3d 379 (4th Cir. 2010), confronted application of the term "custody" under the particular requirements of 18 U.S.C. § 4248, a civil commitment statute. The Court recognized the contextual importance of assessing "legal" or "physical" custody, and rendered a decision that did not touch in any way on § 2(a)(7). *See id.* at 385-90. *Cockerham v. Smith,* 2020 WL 3470324 (6th Cir. 2020), has language that, out of context, offers support to Jordan. However, *Cockerham* dealt with a civilian conviction against an active-duty officer. *See id.* at *2. *Cockerham* cited *Wilson* (again, *United States v. Wilson*, 73 M.J. 529, 531 (A.F Ct. Crim. App. 2014) for the broad notion that the UCMJ applies, in part, to persons housed "in a state or federal facility . . . due to an adjudicated court-martial sentence"). *Cockerham*, 2020 WL 3470324, at *2. However, as *Wilson* well shows, it dealt with UCMJ geographic reach, not to the population covered. And it was *Wilson*, already quoted, that expressly noted how a discharge as to a person being held "outside of military custody," "ends their being subject to the code" under § 2(a)(7). *See Wilson*, 73 M.J. at 533-34. Finally, *United States v. McPherson*, 72 M.J. 862, 869 (A.F. Ct. Crim. App. 2013) is of no help to Jordan. *McPherson* dealt with confinement complaints that arose during a persisting (post-trial but prior to finality) period of active service. That court did not address the § 2(a)(7) applicability for a post-discharge inmate housed in a non-military facility; by definition, as still a service member, not yet discharged, the UCMJ would still have applied to McPherson.

[17] Independent of the disciplinary punishments authorized by BOP Program Statement 5270.09, the warden has the discretion to encumber inmate funds for a variety of reasons, including to satisfy claims and to implement disciplinary measures. *See* BOP Program Statement 4500.12.

Article 55's prohibition against cruel and unusual punishments is at least co-extensive with the protections provided by the Eighth Amendment. *United States v. Gay*, 74 M.J. 736, 740 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016) ("Both the Eighth Amendment and Article 55, UCMJ, prohibit cruel and unusual punishment. In general, we apply the Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, UCMJ, except where legislative intent to provide greater protections under Article 55 ... is apparent."). To state a viable claim, Jordan must demonstrate:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to his health and safety; and (3) that he has exhausted the prisoner-grievance system and petitioned for relief under Article 138, UCMJ, 10 U.S.C. § 938.

*United States v. Merritt*, No. ACM 39754, 2021 WL 527442, at *4 (A.F. Ct. Crim. App. Feb. 11, 2021) (cleaned up), *review denied*, 81 M.J. 448 (C.A.A.F. 2021).

Jordan plainly has failed to establish any of the three requirements to state a viable claim under Article 55. The Court has already concluded that he failed to properly exhaust administrative remedies, and that omission alone forecloses the claim. Jordan also does not allege sufficient facts demonstrating that the warden possessed personal knowledge that the restriction placed Jordan at a substantial risk of serious harm and acted with deliberate indifference with respect to that risk. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994). Most fundamentally, the commissary restriction is not sufficiently "serious" to implicate the Eighth Amendment, because it did not deprive Jordan of access to the necessities of life, including adequate food, clothing, shelter, sanitation, medical care, or personal safety.[18] *Cf. Allah v. Beasely*, No. 3:18-CV-2047, 2019 WL 4511693, at *8 (M.D.

---

[18] The BOP expressly excludes postage stamps and over-the-counter medicines from monthly commissary spending limitations. BOP Program Statement 4500.12 § 3.2(b). And, under BOP regulations and policy, the prison will provide

Pa. Sept. 19, 2019); *United States v. Massillon*, No. ACM 39663, 2020 WL 5778387, at *4, 6 (A.F. Ct. Crim. App. Sept. 28, 2020) (inability to access commissary to purchase sundries did not violate the Eighth Amendment); *Baltas v. Clarke*, No. 7:20cv276, 2021 WL 1080516, at *24 (W.D. Va. Mar. 18, 2021) (holding that limitations placed on commissary spending "do not support an Eighth Amendment claim"); *Ward v. Oliver*, 19 F.3d 1436 (7th Cir. 1994) (In rejecting Eighth Amendment claim based upon seven-month restriction on commissary purchases, the Court noted that "It cannot be meritoriously argued that regular access to soda pop, cigarettes, and snacks falls within the basic necessities of life protected by the Eighth Amendment. Thus, denial of access to these items does not amount to cruel and unusual punishment."). Because the commissary restrictions imposed by the warden do not amount to cruel and unusual punishment, Jordan's claim under Article 55 fails to provide any viable basis for relief.  Notably, Jordan faced the restriction for only a few months before the transfer vitiated the limits.

For each of these reasons, the Court will deny Jordan's petition for a writ of habeas corpus.

Accordingly, the Court **ORDERS** as follows:

1.      The Court **DENIES** Jordan's DE 1 petition for a writ of habeas corpus.

2.      This action is **STRICKEN** from the Court's docket.

This the 16th day of June, 2023.



**Signed By:**

*Robert E. Wier*

**United States District Judge**

---

a prisoner with postage stamps to mail documents to a court for filing if he lacks the funds to purchase them.  *See* 28 C.F.R. § 540.21(d), (f); BOP Program Statement 5265.14 § 13.